IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2024

**IN RE SANTANA M. ET AL.**

**Appeal from the Juvenile Court for Dyer County**
No. 8015      Jason L. Hudson, Judge

_____

**No. W2024-00740-COA-R3-PT**

_____

This is a termination of parental rights case.  Father appeals the termination of his parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with the permanency plan; (3) persistence of conditions; (4) failure to manifest an ability and willingness to assume custody or financial responsibility; and (5) abandonment by an incarcerated parent.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Matthew W. Willis, Dyersburg, Tennessee, for the appellant, Brandon B., Sr.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services

**OPINION**

**I. Background**

Appellant Brandon B., Sr. ("Father") and Michaela M. ("Mother," and together with Father, "Parents") are the parents of the three minor children at issue in this case, Santana M. (d/o/b September  2020), Brandon B. (d/o/b September 2021), and Kitana B.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

(d/o/b November 2022) (together, the "Children").[2]  In December 2021, Appellant Tennessee Department of Children's Services ("DCS") removed Santana and Brandon from Parents' care due to allegations of domestic abuse and illegal drug use, and because Mother and Father were arrested, leaving no one to care for the children.  On March 18, 2022, the Juvenile Court for Dyer County ("trial court") entered an order finding Santana and Brandon to be dependent and neglected based on Parents' stipulations.  When Katina was born in November 2022, she and Mother tested positive for methamphetamine and amphetamines, and Kitana was removed from Mother's care shortly thereafter.  On May 19, 2023, the trial court found Kitana to be dependent and neglected after Mother failed to appear for the dependency and neglect hearing and upon Father's stipulation that he was incarcerated when Kitana was removed to DCS custody.  The Children have remained together in a pre-adoptive foster home since entering DCS custody.

On June 9, 2023, DCS filed a petition to terminate Mother's and Father's parental rights.  In its petition, DCS alleged seven grounds for termination: (1) abandonment; (2) failure to provide a suitable home; (3) abandonment by an incarcerated parent; (4) substantial noncompliance with the permanency plan; (5) persistence of conditions; (6) severe child abuse; and (7) failure to manifest an ability or willingness to care for the children.  The trial court heard the matter on April 5, 2024, and DCS dismissed the ground of severe child abuse at the beginning of the hearing.

By order of April 24, 2024, the trial court found that clear and convincing evidence supported termination of Father's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with the permanency plan; (3) persistence of conditions; (4) failure to manifest an ability and willingness to assume custody or financial responsibility; and (5) abandonment by an incarcerated parent.  The trial court also determined, by clear and convincing evidence, that termination of Father's parental rights is in the Children's best interests.  Father filed a timely notice of appeal.

## II. Issues

Father raises the following issues for review, as stated in his brief:

I. Whether the trial Court erred in admitting conviction records from the City of Newbern, TN Municipal Court in violation of Tennessee Rule of Evidence 902.

---

[2] Mother and Father were never married.  Mother was married to Tommy M. when the children were born, and Father's paternity was determined by genetic testing.  Mr. M. surrendered his parental rights in March 2023 and is not a party to this appeal.  Mother's and Father's parental rights were terminated in the same order, but Mother does not appeal.

II. Whether the trial court erred in admitting the result of DCS administrated [sic] urine drug screens in violation of Tennessee Rule of Evidence 702. Tennessee Rule of Evidence 802, and *McDaniel v. CSX Transp.*, 955 S.W.2d 257 (Tenn. 1997).

III. Whether the trial court erred in determining that grounds for termination existed based on clear and convincing evidence.

IV. Whether the trial court erred in determining that the termination of parental rights was in the best interests of the minor children by clear and convincing evidence.

### III. Standard of Review

We review the trial court's findings of fact *de novo* upon the record with a presumption of correctness. Tenn. R. App. P. 3; *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). However, "[i]n light of the heightened burden of proof in termination proceedings . . . [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* When the trial court has seen and heard witnesses, we give great deference to any findings that are based on the court's assessment of witness credibility. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007). We will not reverse a finding based on witness credibility unless the record contains clear and convincing evidence to contradict it. *Id.* The trial court's conclusion that clear and convincing evidence supports grounds for termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524. Whether the trial court's factual findings amount to clear and convincing evidence that termination is in the child's best interest also is a question of law that we review *de novo* with no presumption of correctness. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

### IV. Evidentiary Issues

We turn first to Father's argument that the trial court erred in admitting his criminal record and the results of drug screens performed by DCS. We review a trial court's determination to exclude or admit evidence under the abuse of discretion standard. *Allen v. Albea*, 476 S.W.3d 366, 378 (Tenn. Ct. App. 2015) (citation omitted). It is well-settled that

a trial court abuses its discretion "only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42

- 3 -

S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). Under this standard, we will not substitute our judgment for the judgment of the trial court. *Id.* (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). The abuse of discretion standard "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,'" and therefore "'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010) (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

*Id.* at 373.

In his brief, Father argues that, under Tennessee Rule of Evidence 902, the trial court erred in admitting records of his convictions in the City of Newbern Municipal Court because they "did not bear the seal of the court on them."[3] He further asserts that the "sole potential attestation or certification was a letter from the court clerk." DCS acknowledges that the records should not have been admitted by the trial court. However, DCS argues that Father's argument pertains to the admissibility of only six records and contends that any error is harmless because the trial court's findings are supported by Father's testimony at trial. We agree with DCS.

As noted above, Santana and Brandan were referred to DCS on allegations of illegal drug use and domestic violence. They entered DCS custody after Mother and Father were arrested, leaving no one to care for the children. Indeed, Father testified that he was arrested for domestic violence in December 2021 and that he "went to jail" five times between December 2021 and the April 2024 trial date on charges of: (1) failure to

---

[3]Rule 902 of the Tennessee Rules of Evidence provides, in relevant part:

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required as to the following:

**(1) Domestic Public Documents Under Seal.** A document bearing a seal purporting to be that of the State of Tennessee, the United States (or of any other state, district, commonwealth, territory, or insular possession thereof, or the Panama Canal Zone, or the Trust Territory of the Pacific Islands), or of a political subdivision, department, office, or agency thereof, and a signature purporting to be an attestation or execution.

**(2) Domestic Public Documents Not Under Seal.** A document purporting to bear the signature in the official capacity of an officer or employee of any entity included in paragraph (1) having no seal, if a public officer having a seal and having official duties in the district or political subdivision of the officer or employee certifies under seal that the signer has the official capacity and that the signature is genuine.

pay child support; (2) "FTA" and failure to pay fines; (3) reckless endangerment; (4) evading arrest; (5) driving on a suspended license; (6) theft; (7) criminal trespass; and (8) violating an order of protection. Although he could not recall the dates, Father testified that he was incarcerated for periods ranging from 19 to 40 days and then continuously from October 2022 until March 2023. Father testified that he was charged with domestic assault against Mother in August 2022, and the June 2023 permanency plan, which was acknowledged and signed by Father, specifically states that Mother and Father "both went to jail" following a physical altercation in December 2021. Father denied that he committed domestic assault against Mother while she was pregnant with Katina, but otherwise acknowledged being arrested for the charges outlined above. Based on Father's testimony alone, his criminal record was established. Accordingly, we agree with DCS that any error in admitting Father's criminal record was harmless. ***See Newcomb v. Kohler Co.***, 222 S.W.3d 368, 388 Tenn. Ct. App. 2006 (quoting ***McClure v. Mexia Indep. Sch. Dist.***, 750 F.2d 396, 402 (5th Cir.1985) (stating: "The improper admission of evidence that is merely cumulative on matters shown by other admissible evidence may be harmless error.")).

Father also argues that, under Tennessee Rules of Evidence 702 and 802, the trial court erred in permitting DCS employees to testify concerning the results of urine drug screens conducted by DCS caseworkers in a non-clinical setting.[4] He argues that "these caseworkers were not tendered as an expert in any area." Father further argues that the test results were maintained only in caseworker notes, and "the original results cannot be ascertained." He submits:

> The Case Worker confirmed that the drug screen performed was a "U-cup" but does not know the manufacturer, the date, or even the year in which the administered tests were manufactured. They did not know the statistical reliability of the test. They did not know if any lots were subject to recall. The worker demonstrated on cross examination that he did not know the scientific basis for how the test [was] performed[.]

Father maintains that the caseworkers could testify only to the readings indicated on the test cup and not to the "science involved." He further contends that testimony regarding

---

[4] Tennessee Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 802 provides:

> Hearsay is not admissible except as provided by these rules or otherwise by law.

the drug screens was not trustworthy under Tennessee Rule of Evidence 703 and, therefore, did not aid the tryer of fact as required by Rule 702.

DCS counters that the caseworkers were not offered as expert witnesses and asserts that their testimony was admissible under Tennessee Rules of Evidence 701(a) and 803(6).[5] DCS also contends that Father completed a consent form acknowledging the test results, and the "U-cup [drug screen] method does not require specialized knowledge as the cup self-reports the results." In the alternative, DCS argues that sufficient evidence of grounds exists even if the caseworkers' testimony regarding the drug screens is excluded. We agree.

Turning to the record, Father signed and acknowledged the June 12, 2023 permanency plan, which specifically stated that Father tested positive for marijuana/THC in April 2023. We also observe that, at the April 2024 trial, DCS case manager Chelsea Atkinson testified, without objection, that, in June 2023, Father admitted to using marijuana. Additionally, at trial, in response to questioning regarding his drug use and drug screen for cocaine, Father asserted his Fifth Amendment rights. The trial court advised Father that it would draw a negative inference based on his assertion of his Fifth Amendment rights to questions regarding his drug use. Accordingly, we agree with DCS that, insofar as Father's drug use contributed to the trial court's finding of grounds, DCS caseworker testimony regarding the drug screens was not necessary. The testimony is cumulative in view of other unrefuted evidence of Father's drug use. *Newcomb*, 222 S.W.3d at 388 (citations omitted).

### V. Grounds for Termination of Parental Rights

It is well-settled that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re*

---

[5] Rule 803(6) of the Tennessee Rules of Evidence provides an exception to the hearsay rule for "records of regularly conducted activity." Rule 701(a) provides:

**(a) Generally.** If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1) rationally based on the perception of the witness and

(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

***Adoption of Female Child***, 896 S.W.2d 546, 547-48 (Tenn. 1995); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. ***In re Angela E.***, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); ***see also Santosky v. Kramer***, 455 U.S. 745 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d at 522-23 (footnote omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights in Tennessee. ***In re Kaliyah S.***, 455 S.W.3d 533, 541 (Tenn. 2015). The version of the statute in effect on the date the petition was filed, *i.e.*, June 9, 2023, is applicable. ***In re Braxton M.***, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). The statute provides, in relevant part:

> (c) Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c). Accordingly, the trial court is required "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[ ]" and, if so, whether termination of the parent's rights is in the child's best interest. ***In re Emarie E.***, No. E2022-01015-COA-R3-PT, 2023 WL 3619594, at *3 (Tenn. Ct. App. May 24, 2023) (quoting ***In re Donna E.W.***, No. M2013-02856-COA-R3PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014)). Although the petitioner needs to establish only one of the statutory grounds set out in section 36-1-113(g) to establish grounds, ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010), we must review the trial court's findings and conclusions as to each ground. ***In re Carrington H.***, 483 S.W.3d at 525-26.

We begin our review of the trial court's finding of grounds by noting that the argument section of Father's brief is confined to the two evidentiary issues discussed above. Father argues that "[w]hen these improperly admitted pieces of evidence are excluded, clear and convincing grounds for termination do not exist." Similarly, Father's

reply brief largely reasserts his arguments regarding the trial court's evidentiary decisions. Without specifying which ground he is arguing, Father asserts that he "attended DA meetings digitally[,]" and argues that "his virtual appearance . . . was the only method in which he could comply with one of the terms of the DCS imposed plan[.]" He further contends that

> the DCS imposed plan required him to have a mental health evaluation and to follow recommendations. However, there is no evidence presented at trial that this requirement was related to any grounds for the removal of the children. Yet, though unrelated to the basis for removal, the unrefuted testimony is that [Father] attended all but one meeting related to his mental health evaluation and follow-up.

These assertions comprise Father's entire argument with respect to grounds.

Generally, an issue designated for review but unaddressed or only minimally addressed in the argument section of an appellant's brief is considered waived. ***Bean v. Bean***, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000). "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." ***Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.***, 301 S.W.3d 603, 615 (Tenn. 2010). Additionally, an appellant's reply brief is limited to a rebuttal of arguments asserted in the appellee's brief. ***Caruthers v. State***, 814 S.W.2d 64, 69 (Tenn. Ct. Crim. App. 1991). An appellant cannot assert a new argument in a reply brief to support an issue raised in his or her initial brief. ***In re Conservatorship of Hathaway***, No. W2020-00687-COA-R3-CV, 2023 WL 8675555, at *6, n.8 (Tenn. Ct. App. Dec. 15, 2023). However, Tennessee Rule of Appellate Procedure 2 affords us the discretion to suspend the briefing requirements. ***Chiozza v. Chiozza***, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009). Therefore, in consideration of the Tennessee Supreme Court's guidance in ***In re Carrington H.*** and the gravity of a trial court's decision to terminate Father's parental rights, we will exercise our discretion to review the trial court's findings concerning the grounds for termination of Father's parental rights.

### A. Abandonment by Failure to Provide a Suitable Home

Under Tennessee Code Annotated section 36-1-113(g)(1), abandonment, as defined by section 36-1-102, is a ground for termination of parental rights. The version of section 36-1-102(1)(A) in effect when DCS filed its petition to terminate Father's parental rights on June 9, 2023 defines abandonment, in relevant part, as:

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at

any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a-c).

It is undisputed that DCS removed Santana and Brandon from Parents' care after Father and Mother were arrested, leaving no one to care for the children. It is also undisputed that, in March 2022, Father stipulated that Santana and Brandon were dependent and neglected. Katina was born while Father was incarcerated in 2022, and she was adjudicated dependent and neglected and removed from Mother's care at birth.

This Court has emphasized that a "suitable home" requires more than an adequate physical space. *In re A'ziya G.*, No. M2022-01282-COA-R3-PT, 2023 WL 2997968 at *8 (Tenn. Ct. App. April 19, 2023) (citing *e.g., In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (citations omitted)). As we have previously stated:

A suitable home is one that is free of violence and illegal drugs. It is a home in which the children receive appropriate care and attention. Additionally, a parent's compliance with counseling and other requirements to address conditions that impact the care and safety of the child are related to the establishment of a suitable home for the child.

- 9 -

*Id.* (citations omitted).

Father testified that he was: (1) homeless for several months after Santana and Brandon were removed to DCS custody and for an additional three-month period thereafter; (2) arrested multiple times throughout the custodial period; and (3) incarcerated for the four months following Katina's birth. At the time of trial, Father remained on probation, and the trial court drew a negative inference from Father's assertion of his Fifth Amendment rights regarding his drug use. However, Ms. Atkinson testified that Father admitted using marijuana. Ms. Atkinson further testified that when she visited Father's home she observed:

> Car parts and car tools all over the outside of the home, there were not cabinet doors on the cabinets, there was a shotgun on the counter, animal waste on the floor, the home was cluttered[.]

She testified that Father refused homemaker and family support services and that, although Father completed a mental health assessment, he did not confirm that he followed through with recommendations. She stated: "[t]he [P]arents have not addressed their A&D issues, their mental health issues, their residential stability issues." Ms. Atkinson further testified:

> I went to the father's home to do a regular home visit and offer services for the [C]hildren to start passes at the home. The [F]ather became irate with me discussing the services. And there was a shotgun on the counter. The [F]ather grabbed the shotgun while yelling at me continuously and walked outside the home, shot off the shotgun, then as I was leaving the home, the [F]ather had the shotgun in his hand and was still yelling at me with the shotgun in his hand.

The trial court found that DCS provided services to Mother and Father "throughout the entirety of the case." These services included: (1) providing information for alcohol, drug and mental health assessments; (2) drug screens; (3) transportation; (4) visitation; (5) Camelot services; (6) housing assistance; (7) WRAP information; (8) domestic violence services; and (9) case management. The trial court also found that neither parent "completed any of the services provided to them[,]" and concluded that the efforts of DCS were reasonable and equaled or exceeded Father's efforts. To the extent the trial court's findings are based on its assessment of witness credibility, we will not reverse those findings absent clear and convincing evidence to the contrary. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007). From our review, we concluded that the evidence clearly and convincingly supports the trial court's termination of Father's parental rights on this ground.

- 10 -

**B. Abandonment by an Incarcerated Parent/Wanton Disregard**

Tennessee Code Annotated section 36-1-102 also provides that abandonment occurs when a parent or guardian is incarcerated either when the petition to terminate his or her rights is filed, or for all or part of the four consecutive months immediately preceding the filing of the petition, and the parent has "engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]" Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c). "In determining abandonment, the court is not to look at the protestations of affections and intentions by the natural parent, but must look at the past course of conduct of such parent." *Mosley v. Dowden*, No. 89-281-11, 1990 WL 7468, at *1 (Tenn. Ct. App. Feb. 2, 1990). We have noted that this ground

> reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child.

*In re A'ziya G.*, No. M2022-01282-COA-R3-PT, 2023 WL 2997968, at *10-11 (Tenn. Ct. App. Apr. 19, 2023) (quoting *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005)). Although incarceration itself is not a ground for termination of parental rights, it prompts the court to consider "'whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the child.'" *Id.* at *11 (quoting *id.*). Termination of parental rights under this section requires the court to find, by clear and convincing evidence, that the parent's pre-incarceration conduct demonstrates a wanton disregard for the child's welfare. *Id.* (quoting *id.*). We have observed that, although section 36-1-102(1)(A)(iv)(c) does not define "wanton disregard," actions that "'reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child[]'" demonstrate such disregard. *In re Nickolas K.*, No. M2023-00951-COA-R3-PT, 2024 WL 1069835, at *9 (Tenn. Ct. App. Mar. 12, 2024) (quoting *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015)). Additionally, a "'parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child.'" *Id.* (quoting *In re Navada N.*, 498 S.W.3d 579, 602 (Tenn. Ct. App. 2016)).

The applicable four-month period is February 9, 2023 to June 9, 2023, and Father testified that he was incarcerated from October 2022 through March 17, 2023. The trial court found:

When you look at the charges and incidents of arrest that [Father] has had it shows a wanton disregard for the [C]hildren's welfare. He has had multiple arrests and charges.

As discussed above, Father testified to multiple arrests and acknowledged many of the circumstances leading to those arrests. He also testified that charges were pending against him in Crockett County at the time of trial, and he asserted his Fifth Amendment rights when faced with questions about his drug use. We agree with the trial court that Father's multiple arrests and periods of incarceration, together with the negative inference regarding his assertion of his Fifth Amendment rights regarding drug use, demonstrate a pattern of wanton disregard on Father's part and supports the trial court's termination of his parental rights on this ground.

### C. Substantial Noncompliance with the Permanency Plans

Under Tennessee Code Annotated § 36-1-113(g)(2), substantial noncompliance with the responsibilities set out in the permanency plan(s) is a ground for termination of parental rights. The trial court found:

There was a total of 3 permanency plans created in this matter prior to the filing of the petition for termination. They were created on January 13, 2022, on July 5, 2022, and on December 13, 2022. The [P]arents knew of the plans' requirements even if they were not present for the making of the plans because they were in court when all of the plans were ratified. The [P]arents completed nothing; they did some of the tasks but nothing to completion. [DCS caseworker Jarvis] Madin testified they accomplished none of the goals and responsibilities in the plans [] and were substantially noncompliant with both plans created during that time. Ms. Atkinson testified that they participated in some assessments when she had the case, but there is no proof before the [c]ourt today of any follow through after those assessments by either parent. [Father] testified he had participated in NA virtually, but the problem with that is proof—if you do it that way you have no proof to offer that you actually attended. . . . The [P]arents have had multiple homes over the course of this case. They have been homeless during the first 5 months after the removal of Santana and Brandon [] in 2021. They have never maintained a stable home. Their visits have not been consistent. Lf you want your kids, the easiest thing to do is show up to visit, but they failed to even show up for visitation. This [c]ourt concludes that clear and convincing evidence was presented that [Father] w[as] in substantial noncompliance with the permanency plans.

Despite reasonable efforts on the part of DCS, the record shows that Father failed to avail himself of the opportunities provided to him. As a result, the evidence shows that

- 12 -

he has utterly failed to satisfy any of the reasonable and necessary requirements of the permanency plans. There is clear and convincing evidence to support the trial court's termination of Father's parental rights on this ground.

## D. Persistence of CondItions

Under Tennessee Code Annotated section 36-1-113(g)(3), parental rights may be terminated if:

The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(iii)    The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

As discussed above, following an altercation in December 2021, the Children were removed from the Parents' custody. Father has been arrested numerous times since 2021, and he was incarcerated when Katina was born. At the time of trial, he was on probation and charges were pending against him in Crockett County.

For many of the reasons previously discussed, Father has failed to make necessary changes to ensure that he can care for these Children. Father has continued to engage in drug use and criminal activity. He has no stable home, and it does not appear that he will remedy these circumstances at any early date. As such, the continuation of the parent/child relationship greatly diminishes the Children's chances of integration into a safe, stable, and permanent home. There is clear and convincing evidence to support the trial court's termination of Father's parental rights on this ground.

**E. Failure to Manifest an Ability and Willingness to Assume Custody**

Finally, we turn to review the trial court's termination of Father's parental rights on the ground of failure to manifest an ability and willingness to assume custody or financial responsibility for the Children under Tennessee Code Annotated section 36-1-113(g)(14). Under this section, parental rights may be terminated if "[a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

Again, for the reasons previously discussed, there is clear and convincing evidence to support the trial court's conclusion that Father has failed to manifest an ability to assume custody of the children, and that placing the Children in his custody would pose a risk of substantial harm to their welfare. We affirm termination of Father's parental rights on this ground.

**VI. Best Interests**

Tennessee Code Annotated section 36-1-113(i)(1) contains a non-exclusive list of factors applicable to the court's best-interests analysis. The statute provides:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court.

At the time of the filing of the petition to terminate Father's parental rights, those factors included, but were not limited to, the following:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
>
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
>
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
>
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

- 14 -

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

*** 

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

*** 

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

*** 

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statutory factors are not exclusive but "illustrative . . . and any party to the termination proceeding is free to offer any other factor relevant to the best[-]interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citation omitted). Whether termination is in the child's best interest must be "'viewed from the child's, rather than the parent's, perspective.'" *Id.* (quoting *In re Audrey S.*, 182 S.W.3d at 878). "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]" *Id.* (quoting Tenn. Code Ann. § 36-1-101(d) (2017)). The court's "'focus on the perspective of the child is the common theme' evident in all of the statutory factors." *In re Neveah M.*, 614 S.W.3d 659, 679 (Tenn. 2020) (quoting *In re Audrey S.*, 182 S.W.3d at 878).

The trial court's best-interest analysis requires "more than a 'rote examination' of the statutory factors." *In re Neveah M.*, 614 S.W.3d at 679 (quoting *In re Audrey S.*, 182 S.W.3d at 878). Further, it "consists of more than tallying the number of statutory factors weighing in favor of or against termination." *Id.* (citing *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004)). Although the court must consider all the statutory factors and other relevant proof, some factors may weigh more heavily than others in light of the circumstances surrounding the particular child and parent. *Id.* (quotation omitted). Indeed, the trial court "may appropriately ascribe more weight— even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors." *Id.* (citation omitted).

The trial court's factual findings relevant to the best-interest analysis must be supported by a preponderance of the evidence. *In re Kaliyah S.*, 455 S.W.3d at 555 (citation omitted). Additionally, the court must determine whether the combined weight of the facts amounts to clear and convincing evidence that termination of parental rights is in the child's best interest. *Id.* (citation omitted). As noted above, we review the trial court's best-interest analysis under the standard of review applicable to mixed questions of fact and law. *In re Taylor B.W.*, 397 S.W.3d at 112-113. We will affirm the trial

court's factual findings unless they are unsupported by a preponderance of the evidence. *In re Neveah M.*, 614 S.W.3d at 674 (citations omitted). Whether the court's factual findings amount to clear and convincing evidence that termination of parental rights is in the child's best interest is a question of law that we review *de novo* with no presumption of correctness. *Id.* (citations omitted).

In its April 2024 final order, the trial court considered the foregoing statutory best-interests factors and found, in relevant part:

> Stability in [C]hildren's lives is extremely important. Where they lay their heads, who is there with them, no domestic violence in the home, no one under the influence—all of these are tantamount for the stability of a child. The only such stability these [C]hildren have had is with their foster parents. They are bonded with the foster parents and the foster family. The [C]hildren know their [P]arents, but there is no proof before the Court today that they are bonded with the [P]arents. The oldest two of these [C]hildren have been in DCS custody since 2021, and the [P]arents have failed to make any changes to their lives or circumstances. These [C]hildren have a critical need for stability and continuity, and their stability and continuity would actually increase with termination of the [P]arents' parental rights.
>
> There has not been a lot of testimony presented on the effect a change of caretakers and physical environment would have on the [C]hildren's emotional, psychological and medical conditions, but there was testimony that one child has leg braces and one child receives occupational therapy. The foster parents have to take the [C]hildren to these appointments and see to these needs, and therefore a change in that situation would impact the [C]hildren, especially with the [P]arents not having reliable transportation.
>
> There is not a showing that the [P]arents have demonstrated any continuity in meeting the [C]hildren's basic housing and safety needs. . . . The [P]arents have not attended enough visitation to progress out of supervised visitation after 2 years of receiving supervised only visitation. You also have to attend visitation in order to form a bond. The [P]arents have not attended enough visitation to make this attachment. The [P]arents have not maintained regular visitation or contact with the [C]hildren, and therefore have not cultivated a positive relationship with the [C]hildren. It is important to visit at every opportunity, and these [P]arents did not do so.
>
> ***
>
> It is unrefuted that the [C]hildren have a healthy parental attachment with the foster parents and are bonded to them. This factor goes along with

factor (H), and the testimony was that the [C]hildren have emotionally significant relationships with the foster parents and the foster family.

Factor (J) is this case in a nutshell. [] Father ha[s] not demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the [C]hildren to be in [his] home . . . . There has been no adjustment by the [P]arents, and it would not be safe for the [C]hildren to be with either of them. The [P]arents did not take advantage of any services or programs offered by Mr. Maclin. They did participate with assessments with Ms. Atkinson, but there is no proof of any follow through with recommendations . . . .

They did not visit and did not take advantage of transportation offered to them for visitation and other services. The Court finds that the Department has made reasonable efforts to assist the [P]arents in making lasting adjustments throughout this case to no avail.

Under factor (M), . . . the [P]arents have shown no urgency in seeking custody of the [C]hildren or in addressing the circumstances, conduct or conditions that make an award of custody to them unsafe and not in the [C]hildren's best interests. The [P]arents here have demonstrated no sense of urgency at any time.

Father has shown brutality toward Mother, so factor (N) does weigh toward termination.

Kitana has never lived in the home of either parent and so factor (0) cannot be applied to her. There is no proof presented as to the other 2 children as to whether the [P]arents have ever provided them a safe and stable home so this cannot be determined to weigh in their favor.

There has been no proof presented that the [P]arents have demonstrated an understanding of the basic and specific needs for their [C]hildren to thrive. There is proof they have not attended any medical visits and are not involved in that aspect of their [C]hildren's care. . . . Father has a home, but the testimony from Ms. Atkinson and Mrs. House is that it is not appropriate for [C]hildren. There is no proof that the [P]arents have demonstrated the ability and commitment to creating and maintaining a home that meets the [C]hildren's needs or that the physical environment of their homes is healthy and safe.

There is not a lot of proof regarding whether the [P]arents have provided more than token financial support for the children. However, Father was recently incarcerated in March of 2024 for not paying support.

***

Considering all of the factors for best interests of the [C]hildren and looking at the best interests of the [C]hildren and not the [P]arents, the Court concludes by clear and convincing evidence pursuant to Tenn. Code

Ann. § 36-1-113(i) that termination of [Father's] parental rights is in the [C]hildren's best interest.

The evidence supports the trial court's conclusion that termination of Father's parental rights is in the Children's best interests. The eldest child was born in 2020, and the Children have been in the same pre-adoptive home since 2021. In short, they have never known a home with Father. The Children's foster mother testified that she and her husband brought Kitana home from the hospital as a newborn. In view of Father's ongoing issues and his lack of progress toward addressing same, there is no indication that he could parent these Children at any early date. Furthermore, as noted by the trial court, Father's home is neither adequate, nor safe for the Children. While Father has failed to make progress in this case, the Children have bonded with their foster family. From the testimony, the Children have no bond with Father, and they never asked about him. Continuation of the parent/child relationship would not be in the Children's best interests as it would only delay their full integration into the foster parents' stable and loving home, which is the only home they have ever known.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Father's parental rights. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed to the Appellant, Brandon B., Sr. Because Appellant is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE

- 19 -